IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


SAMUEL C. JENNINGS                                                                        PLAINTIFF


v.                              NO. 1:17-cv-00006 PSH


NANCY A. BERRYHILL, Acting Commissioner                           DEFENDANT
of the Social Security Administration


MEMORANDUM OPINION AND ORDER

Plaintiff Samuel C. Jennings ("Jennings") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Jennings maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Jennings first maintains that his mental impairment meets or equals a listed impairment, and the ALJ failed to so find at step three of the sequential evaluation process. Jennings also maintains that his residual functional capacity was erroneously assessed. He so maintains because his failure to take his medication as prescribed was excusable given his mental impairment and because the opinions of his treating sources were never obtained.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The record reflects that Jennings was born on December 12, 1995, and was seventeen years old when he allegedly became disabled beginning on October 23, 2013. He filed an application for child's disability benefits on March 15, 2014, and alleged that he became disabled as a result of symptoms associated with paranoid schizophrenia. See Docket Entry 169.[2]

A summary of the medical evidence reflects that Jennings has sought medical attention for the symptoms associated with his mental impairment on multiple occasions. On October 24, 2013, he was admitted to the Pinnacle Pointe Hospital ("Pinnacle Pointe") after he was expelled from school for attacking and injuring another student and for threatening to kill several other students. See Transcript at 300-310. A mental status examination was performed after his arrival at Pinnacle Pointe, and the following observations were recorded:

> The patient is an average build, neatly dressed and groomed Caucasian boy who is alert and cooperative, relates in a quiet, subdued manner. Speech is logical, relevant, and fluent without articulation or processing difficulties. He admits to explosive, out of control temper, and violent, aggressive behaviors, and having made threats to peers at school, but denied any current homicidal ideation. He continues to feel paranoid that the school is trying to poison him and that people are out to get him. Cognitively, he presents as intact and oriented. He is able to recall address, birthday, phone number, spell "house" forward and backwards, and do serial-3 subtractions quickly and easily. Intellectually, he presents as average by vocabulary and fund [sic] of knowledge. Judgment and insight are impaired as evidenced by the violent, aggressive behaviors, homicidal threats, and paranoia.

---

[2] A child may obtain disability benefits on the basis of the employment record of a deceased individual upon whom the child was dependent at the time of the individual's death. See 42 U.S.C. 402(d). The child's disability must have begun before he attained the age of twenty-two. See 42 U.S.C. 402(d)(1)(B). The Commissioner represents, and the Court accepts, that "[child's disability benefits] claims are evaluated using the same criteria for adult disability benefits set forth in 42 U.S.C. 423(d)." See Docket Entry 13 at CM/ECF 1.

Here, Jennings seeks benefits on the basis of the employment record of his mother, Aylene Gallegos, also known as Aylene Dickerson. See Transcript at 46, 153. She died on December 19, 1997. See Transcript at 46, 153.

See Transcript at 305. Jennings was diagnosed with, inter alia, mood and psychotic disorders and prescribed Abilify. When he was discharged on November 4, 2013, he was observed to be medically stable and no longer exhibiting aggressive symptoms. He was referred to Families, Inc., ("Families") for individual and family therapy.

Jennings and/or members of his family thereafter saw the mental health professionals at Families in excess of forty-five times between November of 2013 and January of 2015.[3] The initial progress notes reflect that he reported difficulties controlling his anger and getting along with others. Following an April 3, 2014, examination, Dr. Richard Lucas, M.D., diagnosed Jennings' primary impairment as paranoid type schizophrenia. See Transcript at 456. Jennings reported difficulties with his medication on several occasions, and it was repeatedly adjusted. He was prescribed, at times, Risperdal, Invega, Trazodone, Remeron, Topamax, and Zyprexa. See Transcript at 447. Generally, as his medication was adjusted, and he took it as prescribed, his condition improved. For instance, in a May 6, 2014, progress note, Jennings was noted to be compliant with his medication and reported feeling better. He was observed to be "more open and responsive" and "more relaxed." See Transcript at 440. In a June 3, 2014, progress note, the following observations were made:

---

[3]   See Transcript at 363-377, 386-389 (11/15/2013); 461-463 (12/12/2013); 382-385 (02/13/2014); 421-422 (02/14/2014); 419-420 (02/17/2014); 417-418, 445-446 (02/25/2014); 415-416, 458-460 (03/13/2014); 413-414 (03/18/2014); 443-444 (03/25/2014); 410-412 (04/02/2014); 455-457 (04/03/2014); 408-409 (04/08/2014); 441-442 (04/10/2014); 405-407 (04/15/2014); 402-404 (04/19/2014); 439-440 (05/06/2014); 437-438 (05/07/2014); 452-454 (05/08/2014); 400-401 (05/13/2014); 378-381 (05/15/2014); 435-436 (05/21/2014); 431-432, 433-434 (06/02/2014); 396-397, 398-399 (06/03/2014); 449-451 (06/05/2014); 429-430 (06/07/2014); 394-395 (06/13/2014); 392-393 (06/17/2014); 427-428 (06/18/2014); 425-426 (07/01/2014); 390-391, 503-504 (07/08/2014); 423-424, 509-510 (07/11/2014); 507-508 (07/15/2014); 521-523 (07/17/2014); 501-502 (07/22/2014); 505-506 (07/30/2014); 498-500 (08/01/2014); 496-497 (08/05/2014); 476-479, 494-495 (08/12/2014); 492-493 (08/26/2014); 490-491 (09/02/2014); 488-489 (09/09/2014); 486-487 (09/23/2014); 484-485 (10/07/2014); 518-520 (10/09/2014); 482-483 (10/21/2014); 472-475, 480-481 (11/04/2014); 515-517 (11/26/2014); 663-664, 665-666 (01/05/2015); 667-668, 669-670 (01/13/2015); 671-673, 673-674 (01/20/2015).

> [Jennings] explained he is getting along with family members. He expressed he has decreased his hand gestures and loud talking out in public while with family members. … He showed no signs of paranoid behaviors during the sessions. He explained he has helped his father with some tasks at work so that he was able to get out of the house. He reported he may continue to help [his] father with work.

See Transcript at 399. The mental health professionals at Families made similar observations during the approximately six month period that followed, again, as long as Jennings took his medication as prescribed. In an October 7, 2014, progress note, the following observations were made:

> [Jennings] explained he went on a trip with his [u]ncle over the weekend. [Jennings] expressed they went to a powwow with different tribes. He explained during the trip he did not have any paranoid thoughts or behaviors. He expressed that he had a "good time." [The mental health professional] and [Jennings] discussed ways to remain productive in his life. [Jennings] explained he feels as if he is in "a rut." He and [the mental health professional] explored ways to break the time up during the day. [They] discussed "jobs, volunteering, working around the home, playing drums."

See Transcript at 485. In a November 4, 2014, progress note, the following observations were made: "… [Jennings] expressed he enjoys the drums and music. He explained he got a part time job [raking leaves] and helping out an elderly lady around her home. He expressed several times he would like more out of life and become something of himself." See Transcript at 481.

Jennings' condition became less stable, though, when he did not take his medication as prescribed. For instance, Jennings' grandmother visited with a mental health professional from Families on January 5, 2015, and provided the following report concerning Jennings' mental health:

4

> Nancy [i.e., Jennings' grandmother] reports "[Jennings] has not been taking his medicine. He acts like a Wildman. He comes to my house and wants money. He told me last night that if I did not give him what he wanted that he was going to break my legs. I told him to get out. He did. My son was here and my boyfriend last night when [Jennings] said that so I was not afraid of him. He left." ...

See Transcript at 664. The mental health professional opined that Jennings was "regressing due to not taking his medication." See Transcript at 664.

On April 19, 2014, or during the period Jennings was seeing the mental health professionals at Families, he was arrested on charges of criminal trespass and public intoxication. He was referred by the Izard County Sheriff's Department to the BridgeWay ("BridgeWay"), a psychiatric hospital, where he was hospitalized for nine days. See Transcript at 343-361. At the time of his admission, the following observations were recorded: "... [Jennings] has had disorganized thoughts with an inappropriate affect and was uncooperative with the initial evaluation. He is noncompliant with medication. He reports being easily agitated with significant paranoia. No suicidal or homicidal ideations at this time." See Transcript at 345. He was prescribed Zyprexa, and it appears to have been of some benefit. Dr. Victor McNerney, M.D., noted the following in a discharge summary:

> ... [Jennings] had no episodes of agitated or combative behavior. He was easily redirected by nursing staff. He was calm. He interacted appropriately with peers. His encounters with me were relatively brief. He had notable negative symptoms of schizophrenia including hypoverbal speech, poor inner social relatedness, and in general a lack of interest in socialization. However, he did not exhibit any significant positive symptoms of schizophrenia. His schizophrenia appeared consistent with undifferentiated type of possibly disorganized type. ...

See Transcript at 343.

On August 6, 2014, Jennings was seen by Dr. Nancy Bunting, Ph.D., ("Bunting") for a mental status examination and an evaluation of adaptive functioning. See Transcript at 465-470. Her observations included the following:

> [Jennings] was alert, attentive, and superficially cooperative. Once this patient stated early in the interview that he had had NO psychiatric hospitalizations, the examiner became very careful and validated information later with the father in a separate session. In no way nor at any time did this patient appear to be psychotic, out of touch with reality, or delusional. On the contrary he appeared to be quite competent, and once he denied any hospitalizations the examiner had to seriously consider the possibility that he is a liar.

See Transcript at 467. Bunting observed that Jennings' thought processes were logical, relevant, and goal-directed. She diagnosed, inter alia, an antisocial personality disorder. With respect to his symptoms, she opined, in part, the following:

> While [Jennings] had one stilted sentence, this seemed to be a function of his disdain for the evaluation and NOT any indication of psychosis. …
>
> This patient is not a reliable informant. …
>
> [Jennings'] father's remark about "milking" the system for sympathy since grade school would be consistent with an antisocial personality disorder. His father was quite distraught as he cannot afford to support this young man and he knows that he has access to the $10,000. The patient's almost immediate question about what the examiner was writing suggest he was very aware of the nature of the interview and he was careful about what he revealed. His answers sometimes seemed "cagey." This would also be consistent with the patient's personality disorder.

See Transcript at 468. With respect to the effects of Jennings' impairments on his adaptive functioning, Bunting opined the following:

> [Jennings] can do all of his self-care. He smokes a half of a pack of cigarettes daily, but does not chew tobacco. He drinks a liter of cola daily.

> The father drove the patient to the appointment today. The patient does not have a driver's permit. He does shop by himself and he has no problems doing that. He has never used a check book. He has no difficulties counting change. He has never paid any bills. He can do household chores like washing dishes, doing laundry, sweeping, cleaning, vacuuming and cooking, although his only "chore" is to take out the trash. He spends his time watching television, listening to the radio and other music, playing the Xbox for one hour at a time, and using the internet for facebook and YouTube. He reads magazines. He enjoys skateboarding.
>
> The patient does not have a girlfriend. He is in contact with his one brother. He has friends, but he is not involved in church or any other group. He has contact with his neighbors.
>
> The patient communicated and interacted in a socially adequate, but flippant, manner.
>
> The patient could communicate in an intelligible and effective manner when he wanted to.
>
> The patient's performance on serial 3s was fair, and he counted backward from 20 adequately. His immediate recall was adequate, and digit span was in the borderline range. He has the capacity to cope with the typical cognitive demands of the basic work like tasks. He has had the ability to deal with peers and teacher until this last year suggesting a change, possibly involving substances. He can deal with the public appropriately when he wants to. He can handle work stress or changes. He can follow instructions when he wants to.
>
> The patent was able to attend and sustain his concentration in the interview which focused on himself. … He has the ability to sustain his concentration on basic tasks.
>
> The patient did persist in the interview. He is capable of doing this for at least short periods of time. His frustration tolerance appeared to be limited by his personality disorder and possible substance abuse.
>
> He has the capacity to complete tasks within an acceptable period of time. His pace on the mental status items was adequate.

See Transcript at 469. Bunting observed that Jennings appeared to be guarded and dishonest throughout the evaluation, giving a "minimal level of effort and cooperation." See Transcript at 470.

7

On February 19, 2015, Jennings returned to BridgeWay after threatening his father with a knife. See Transcript at 583-590. He continued to be treated with Zyprexa and was observed for six days. He was deemed to have "received maximum benefit from inpatient hospitalization as of February 25, 2015," see Transcript at 589, and was discharged the next day. The discharge summary reflects that he denied auditory or visual hallucinations, was not acutely paranoid, but was cooperative and appreciative of the care he received.

Beginning on March 23, 2015, and continuing through at least January 28, 2016, Jennings was seen at Daysprings Behavioral Health/Health Resources of Arkansas ("Daysprings") for therapy and medication checks on what appears to have been in excess of twenty-five occasions.[4] Dr. Thomas Zurkowski, M.D., diagnosed Jennings with paranoid type schizophrenia and a mood disorder and prescribed medication that included Zyprexa and Trazadone. The observations of Jennings throughout the approximately ten month period were largely consistent. He was observed to have poor judgment and manifested, at times, bizarre behaviors and beliefs. Jennings was observed to be socially inept, have difficulty with interpersonal interactions, and have few social supports. In an October 22, 2015, progress note, a social worker observed that Jennings was in need of "daily supervision and monitoring by his father, uncle, and grandmother due to [Jennings'] lack of daily living skills and recognition of social norms." See Transcript at 690.

---

[4] See Transcript at 609-615 (03/23/2015); 616-618 (03/30/2015); 619-622 (04/01/2015); 623-624 (04/03/2015); 625-626 (04/09/2015); 627-628 (04/23/2015); 629-630 (05/07/2015); 631-632, 633-637 (06/11/2015); 638-639, (07/23/2015); 640-641 (07/31/2015); 642-643 (08/13/2015); 644-645 (08/20/2015); 646-647 (08/27/2015); 648-649, 650-654 (09/03/2015); 655-656 (09/10/2105); 657-658 (09/24/2015); 692-693 (10/08/2015); 723-725 (10/14/2015); 690-691 (10/22/2015); 688-689 (11/05/2015); 686-687 (11/19/2015); 710-715 (12/01/2015); 684-685 (12/03/2015); 682-683 (12/16/2015); 721-725 (12/30/2015); 680-681 (01/28/2016).

On October 19, 2015, Dana Hicks ("Hicks"), a Registered Nurse at the Community Medical Center of Izard County, signed a "To Whom It May Concern" letter on behalf of Jennings. See Transcript at 677. In the letter, Hicks attested to problems caused by Jennings' mental impairment and the difficulties those problems had caused his grandmother.

Jennings, his father, and his grandmother completed a series of documents in connection with Jennings' application for child's disability benefits. See Transcript at 177-184, 185-186, 187-194, 195-204, 214-222, 223-224. They represented that Jennings does little during the day; he typically just watches television, plays video games, and listens to music. He can attend to some of his personal needs, can prepare simple meals, but does very little house or yard work. He cannot pay attention for any length of time, cannot finish what he begins, and can follow neither written nor spoken instructions because he cannot concentrate.

Jennings testified during the administrative hearing. See Transcript at 38-46. He attended school through his senior year of high school but did not graduate because he was expelled for fighting. He has considered taking classes in an attempt to obtain his GED. He admitted that he sometimes does not take his medication and must be reminded by his grandmother to do so. He denied hearing voices in his head or seeing things that other people cannot see.

Jennings' grandmother also testified during the administrative hearing. See Transcript at 46-65. They live together in the same house. She testified that Jennings cannot be believed and "lies to [her] all the time." See Transcript at 47. When asked whether Jennings has a tendency to not take his medication, she testified as follows:

9

> Not anymore. Last time he went to the—to BridgeWay last February [19, 2015], I think they put the scare in him and he's been very good about taking it since then. He tells me sometimes it's time for my medicine and goes and takes it himself.

See Transcript at 48. Jennings laughs and smiles at inappropriate times, will sometimes bare his teeth, and will sometimes appear to stare at objects that no one else can see.

Jennings' father also testified during the administrative hearing. See Transcript at 65-75. Until recently, Jennings' medications of Zyprexa and Thorazine helped make him "manageable." See Transcript at 69.

At step two of the sequential evaluation process, the ALJ found that Jennings has a severe impairment in the form of paranoid schizophrenia. The ALJ found at step three that the impairment does not meet or equal Listings 12.03. The ALJ assessed Jennings' residual functional capacity and found that he can perform unskilled work. In so finding, the ALJ gave great weight to Bunting's opinions. With respect to Jennings' failure to take his medication as prescribed, the ALJ found the following:

> ... The treatment records show a pattern of noncompliance with medications. ... The claimant has been on many medication trials and recent records indicate that he is currently prescribed Risperdal, Trazadone, and Zyprexa. ... However, throughout the medical records it was indicated that the claimant was non-compliant with treatment and at the hearing, the claimant's grandmother's testimony supported this finding. This demonstrates a possible unwillingness of the claimant to do what is necessary to improve his condition. It may also be an indication that his symptoms are not as severe as his purports. ...

See Transcript at 27. The ALJ found at step four that Jennings has no past relevant work but found at step five that there is other work he can perform. The ALJ concluded that Jennings is not under a disability as defined by the Social Security Act.

Jennings first maintains that his mental impairment meets or equals paragraph C of Listing 12.03, and the ALJ failed to so find at step three.[5] It is Jennings' position that the record documents a "consistent and continuous pattern of irrational, delusional, paranoid, aggressive, and socially inept behavior." See Docket Entry 11 at CM/ECF 15.

At step three, the ALJ is required to determine whether a claimant's impairments meet or equal a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is solely a medical determination, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that his impairment meets or equals a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Substantial evidence on the record as a whole supports the ALJ's finding at step three because Jennings cannot show that his impairment meets or equals paragraph C of Listing 12.03. Although he can show a psychotic disorder of at least two years' duration that has caused more than a minimal limitation of the ability to do basic work activities, he cannot show the requirements of sections (1), (2), or (3) of paragraph C.

---

[5] A new version of Listing 12.03 went into effect on January 17, 2017. The new version encompasses "schizophrenia spectrum and other psychotic disorders." The Court will review Jennings' assertion of error, though, in accordance with the version of the listing in effect at the time the Commissioner's decision became final, i.e., December 2, 2016. See Garrett, o/b/o Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final.")

The version of Listing 12.03 that the Court will use encompassed schizophrenic, paranoid, and other psychotic disorders. The required level of severity was shown when the claimant could satisfy the requirements of paragraphs A and B of Listing 12.03 or when the claimant could satisfy the requirements of paragraph C of Listing 12.03. Paragraph C required a showing of a psychotic disorder of at least two years' duration that caused more than a minimal limitation of the ability to do basic work activities and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Section (1) requires a showing of repeated episodes of decompensation, each of extended duration.[6] At most, Jennings can show three such episodes, i.e., a 2013 hospitalization at Pinnacle Pointe and hospitalizations at BridgeWay in 2014 and again in 2015. The hospitalizations were over the course of three years and only one of them lasted for more than ten days. Although he had periods when his condition became less stable, the periods were largely caused by his refusal to take his medication as prescribed.

Section (2) requires a showing of a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.[7] The ALJ could and did find that Jennings is capable of attending to his self-care, preparing simple meals, performing basic chores, assisting other people, and some travel. Although Jennings spends much of his time alone, the ALJ could and did find that Jennings watches television, plays video games, listens to music, shops around other customers, and maintains some relationships. The ALJ could and did also credit Bunting's observations that Jennings is capable of sustaining concentration and persistence. These findings support the conclusion that a minimal increase in mental demands or change in the environment would not cause Jennings to decompensate.

---

[6] "Episodes of decompensation are defined as 'exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.'" See Richardson v. Berryhill, 2017 WL 1532268, 6 (N.D. Iowa 2017) (internal citations and quotations omitted), report and recommendation adopted, 2017 WL 2219983 (N.D. Iowa 2017). Repeated episodes, each of extended duration, means "three episodes within [one] year, or an average of once every [four] months, each lasting for at least [two] weeks.'" See Id.

[7] Section (2) focuses on factors such as the claimant's activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace. See Bellew v. Acting Commissioner of Social Security, 605 Fed.Appx. 917, 927 (11th Cir. 2015).

Section (3) requires a showing of a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.[8] Although Jennings lives with his grandmother and she has admirably attempted to provide some support and care for him, the ALJ could and did find that Jennings has only mild limitations in such areas as his activities of daily living. In short, there is no evidence that Jennings requires a highly supportive living situation.

Jennings offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Jennings maintains that his residual functional capacity was erroneously assessed. He so maintains because his failure to take his medication as prescribed was excusable given his mental impairment and because the opinions of his treating sources were never obtained.

The ALJ is also required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, see Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010), including the claimant's subjective statements about his capabilities, see Partee v. Astrue, 638 F.3d 860 (8th Cir. 2011). The assessment must nevertheless be supported by "some medical evidence of the claimant's ability to function in the workplace." See Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007).

---

[8] "Highly supportive" settings include "hospitals, halfway houses, care facilities, and personal home settings that greatly reduce the mental demands placed on [the claimant]." See Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013) (internal citation and quotation omitted).

13

Jennings clearly has limitations caused by paranoid schizophrenia. The question for the ALJ was the extent to which the limitations impact the most Jennings can do. The ALJ incorporated limitations for the impairment into the assessment of Jennings' residual functional capacity but found that he was not disabled for purposes of the Social Security Act. The ALJ could find as he did because substantial evidence on the record as a whole supports his consideration of the evidence and his assessment of Jennings's residual functional capacity. The Court so finds for the following reasons.

The ALJ adequately considered the medical evidence. Specifically, the ALJ adequately considered the findings and opinions of the medical professionals at Pinnacle Point and BridgeWay. Although the ALJ made only passing mention of the findings and opinions of the medical professionals at Daysprings, the ALJ adequately considered the findings and opinions of the medical professionals at Families and those made by Bunting. It is the ALJ's responsibility to assign appropriate weight to the various medical opinions, see Bentley v. Shalala, 52 F.3d 784 (8th Cir. 1995), and, in this instance, the ALJ could and did give great weight to Bunting's opinions because she personally observed and examined Jennings and because her opinions are consistent with her observations. Thus, there is support in the record for the propositions that Jennings is capable of self-care, is capable of performing most activities of daily living, is capable of communicating in an intelligible and effective manner "when he want[s] to," is capable of dealing with the public appropriately "when he wants to," is capable of attending and sustaining concentration and persistence, is capable of handling some work stress or changes, and can follows instructions "when he wants to." See Transcript at 469.

Jennings faults the ALJ for failing to obtain opinions from his treating sources, specifically, from Dr. Richard Lucas, M.D., a physician at Families, and from Dr. Thomas Zurkowski, M.D., a physician at Daysprings. The ALJ is obligated to recontact medical sources and, in some instances, order a consultative evaluation only if the "available evidence does not provide an adequate basis for determining the merits of the disability claim." See Webb v. Colvin, 2014 WL 4668974, 29 (D. Minn. 2014) (internal quotations and citation omitted). "While the ALJ has an independent duty to develop the record on a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." See Id. (internal quotations and citation omitted). Here, the record provided an adequate basis for determining the merits of Jennings' disability claim. The record contains the findings and opinions of the medical professionals at Pinnacle Pointe, BridgeWay, and Families, and, to a lesser extent, Daysprings. The record also contains the findings and opinions of Bunting, a consultative examiner who actually saw Jennings. Although opinions from additional sources might have been beneficial, they were not necessary.

The ALJ also considered the non-medical evidence. Specifically, the ALJ adequately considered the representations made by Jennings and his family members to the medical professionals, the representations contained in the disability documents, and Jennings' testimony during the administrative hearing. The ALJ could and did note numerous inconsistencies, inconsistencies that included his statements regarding his alcohol and drug abuse. The ALJ could and did find that the inconsistencies diminished the persuasiveness of his subjective complaints and alleged functional limitations.

Jennings faults the ALJ for failing to consider whether Jennings' failure to take his medication as prescribed was excusable. Jennings' assertion lies at the heart of this case, i.e., the extent to which his failure to do so is a result of his mental impairment.

A mentally ill person's noncompliance with psychiatric medication can be, and usually is, a result of his mental impairment and therefore "neither willful nor without a justifiable excuse." See Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir.2009). In Pate-Fires, the claimant suffered from a severe bipolar disorder that caused manic behavior, homicidal threats, paranoid delusions, significantly impaired insight, and a complete denial of the impairment. "Although there was overwhelming evidence in the record expressly indicating that the claimant's severe mental disorder caused her noncompliance with psychiatric medication, the ALJ held that such noncompliance was not justified." See Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). The Court of Appeals reversed, "concluding that the ALJ's decision failed to recognize that the claimant's noncompliance was a manifestation of her schizoaffective disorder and that noncompliance with psychiatric medication is common among persons with such disorders." See Id.

"Whether severe mental illness has resulted in justifiable noncompliance is a fact-intensive issue." See Hensley v. Colvin, 829 F.3d 926, 935 (8th Cir. 2016). Because it is, the decision in Pate-Fires has, on occasion, been distinguished. For instance, it has been distinguished on the ground that a claimant's mental impairments are not as extreme as the claimant's mental impairments were in Pate-Fires, see Guthrie v. Colvin, 2014 WL 5023508 (W.D.Ark. 2014), and when there is no evidence linking a claimant's mental limitations to his noncompliance, see Wildman v. Astrue, supra.

The case at bar is distinguishable from Pate-Fires in two respects. First, there is considerable question whether Jennings' paranoid schizophrenia causes the type of manic behavior, homicidal threats, paranoid delusions, significantly impaired insight, and a complete denial of the impairment as was present in Pates-Fires. Although he has had episodes when he manifested bizarre behaviors and beliefs and made homicidal threats, the episodes were sporadic.

Second, there is not "overwhelming evidence in the record expressly indicating that [Jennings'] severe mental disorder causes [his] noncompliance with psychiatric medication." See Wildman v. Astrue, 596 F.3d at 966. Instead, there is conflicting evidence on the question of whether his paranoid schizophrenia causes his noncompliance. On one hand, Bunting was quite forceful in opining that Jennings "[i]n no way nor at any time ... appear[ed] to be psychotic, out of touch with reality, or delusional." See Transcript at 467. Instead, she observed that he appeared to be "quite competent," see Transcript at 467, and can follow instructions "when he wants to," see Transcript at 469. Jennings' grandmother testified that although Jennings "lies to [her] all the time, see Transcript at 47, he was "very good" about taking his medication once the medical professionals at BridgeWay "put the scare in him ...," see Transcript at 48. On the other hand, a licensed clinical social worker at Daysprings observed that Jennings is in need of "daily supervision and monitoring by his father, uncle, and grandmother due to [Jennings'] lack of daily living skills and recognition of social norms." See Transcript at 690. Although the ALJ's finding on the issue is not a model of thoroughness, see Transcript at 27, the ALJ could conclude that Jennings' failure to take his medication as prescribed is not a result of his mental impairment.

The Court is obligated to consider evidence that both supports and detracts from the ALJ's decision. See Goff v. Barnhart, 421 F.3d 785 (8th Cir. 2005). "If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision." See Id. at 789 [citing Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001)]. The case at bar is such an instance. It is possible to construe the evidence in such a way as to find that Jennings' failure to take his medication as prescribed is a result of his mental impairment. It is also possible to construe the evidence in such a way as to find that Jennings' failure to take his medication as prescribed is not a result of his mental impairment. Because it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the ALJ's findings, the Court will not disturb the ALJ's decision.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Jennings' complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 2nd day of October, 2017.

_____
UNITED STATES MAGISTRATE JUDGE